NORMAN JONES, Petitioner-Appellant, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD et al., Respondents-Appellees.

First District (5th Division) No. 1—92—3394

Opinion filed May 5, 1995.

Robert H. Hanaford, of Chicago, for petitioner.

Gilbert A. Cornfield, of Cornfield & Feldman, of Chicago, for respondent Illinois Federation of Teachers, AFT, AFL-CIO.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Robert G. Toews, Assistant Attorney General, of counsel), for respondent Illinois Educational Labor Relations Board.

JUSTICE GORDON delivered the opinion of the court:

On February 4, 1992, the petitioner, Norman Jones, filed an unfair labor practice charge with the Illinois Educational Labor Relations Board (hereinafter Board), alleging that respondent Illinois Federation of Teachers, AFT, AFL-CIO (hereinafter Federation), breached its duty of fair representation under section 14(b)(1) of the Illinois Educational Labor Relations Act. (Ill. Rev. Stat. 1991, ch. 48, par. 1714(b)(1) (hereinafter IELRA).) He maintains that the Federation breached that duty by declining to provide him with legal representation in a Federal civil rights lawsuit against his employer, Township High School District No. 211 (District 211), in which he claimed that District 211 both retaliated against him for exercising his first amendment right of free speech and discriminated against him based on his age.

In a recommended decision, the Board's Executive Director found that the Federation did not breach the duty of fair representation. (See *AFT, IFT (Jones)*, 8 Pub. Employee Rep. (Ill.) par. 1072, Nos. S—CA—92—171, S—CB—92—29 at IX—267 (IELRB, July 1, 1992).) The petitioner filed exceptions to the Executive Director's recommended decision which the full Board struck for failure to file a certificate of service. (See *AFT, IFT (Jones)*, 8 Pub. Employee Rep. (Ill.) par. 1101, No. 92—CB—0029—C at IX—360 (IELRB September 11, 1992).) The petitioner filed a timely request for review of the Board's order.

FACTS

The petitioner was employed as a Palatine High School guidance counselor from 1966 until 1984. In 1984, he was transferred to a position as a physical education teacher at another high school within District 211. The petitioner maintains that the transfer was the culmination of harassment which resulted from criticisms he made of District 211 and its policies.

In May 1984, after seeking intervention by Local 1211 of the District 211 Teachers Union (Local 1211) and of its parent union, the Federation, the petitioner, at their direction, wrote to one of their attorneys, Barbara Hillman, setting forth his grievance. In his letter he requested that Hillman "do all you can do to file charges centering around this continued and calculated job harassment or whatever legal avenue you think is best" and further requested that she "try

to obtain an injunction for me to prevent the transfer." He also asked whether "we can obtain a money settlement."

In a letter dated July 7, 1984, the president of Local 1211 informed the petitioner that Hillman reviewed his complaint and concluded that it had been "pursued to the lengths mandated by the Governing Board and that the case should now be considered closed." The record does not reveal whether the petitioner specifically requested that Local 1211 initiate a grievance procedure on his behalf under the collective bargaining agreement.

In June of 1985, the petitioner employed private counsel to file a lawsuit against District 211 and three District 211 officials in the United States District Court for the Northern District of Illinois. His Federal complaint alleged that his 1984 transfer and reassignment as a physical education teacher were in retaliation for his criticism of District 211 and therefore violated his first amendment right of free speech and that those same actions by District 211 also violated the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 *et seq.* (1988)).

After filing his Federal lawsuit, the petitioner again approached Local 1211 and asked for its assistance in prosecuting that action. Local 1211 thereupon requested that another lawyer from the same law firm as Hillman, Melissa Auerbach, review his grievance. In an August 12, 1985, opinion letter addressed to Local 1211 Auerbach stated that the petitioner "would be unlikely to prevail in an age discrimination lawsuit against *** District [211]." She did not address any claim based on a violation of his first amendment rights. On September 3, 1985, the president of Local 1211 wrote to the petitioner "that any further Union action concerning your case would not end with positive results" and therefore rejected his request for assistance.

On February 2, 1990, the district court denied a motion for summary judgment which District 211 filed with respect to the petitioner's first amendment claim and deferred ruling on that motion with respect to the age discrimination claim pending additional briefing. Subsequently, at a date not disclosed in the record, the petitioner's action against District 211 was dismissed with prejudice for want of prosecution. (The petitioner's counsel represented at oral argument that the Federal action was dismissed because no one appeared on behalf of the petitioner at three successive status calls.)

In a letter to the president of Local 1211 dated March 15, 1990, the petitioner again requested funding for his past and future legal expenses in the civil rights action against District 211. Correspondence continued between the petitioner and Local 1211 throughout

1990 until it arranged for him to again meet with one of its attorneys, Mildred Haggerty, to discuss the merits of his Federal suit. That meeting occurred on December 4, 1990.

In a February 3, 1991, opinion letter addressed to Local 1211, Haggerty stated that "I do not believe that the evidence presented to us by [the petitioner] is strong enough for the Union to reverse its earlier decision not to fund the case, particularly in light of its [dismissal with prejudice]. Should it decide to fund the case, the Union would deplete its somewhat limited resources in a case which is, at best, extremely difficult." Local 1211 thereupon informed the petitioner that it would not change its earlier decision with respect to funding his litigation.

Thereafter, the petitioner began an exchange of correspondence between himself and the Federation, bypassing Local 1211. On March 11, 1991, the petitioner wrote the Federation's president, seeking funding for his past legal fees and his prospective legal fees in the event of an appeal from the dismissal of his action against District 211. In a letter dated March 25, 1991, the assistant to the Federation's president replied that he would review the matter and encouraged the petitioner to forward additional information. The petitioner thereupon submitted a 24-page response in support of his request.

In a letter dated June 10, 1991, the assistant to the Federation's president wrote to the petitioner, informing him that he and an attorney retained to advise the Federation reviewed the materials he sent but were of the opinion that Local 1211 properly denied funding. The letter stated that "[w]e find no evidence in your packet that would sustain a ruling in your behalf. If such is present, please cull that from this packet for our attention or submit it for our review. Lacking such evidence, the legal opinions of Ms. Hillman and Ms. Haggerty would be affirmed as legally correct."

The petitioner replied in a letter dated July 3, 1991, that he found the Federation's letter of June 10 "to be evasive and a continuation of the usual lackadaisical union legal tactics designed to escape from using funds to back a deserving teacher." Under the threat of "fil[ing] charges," the petitioner requested that the Federation either pay his past and future legal fees or pay his past legal fees and $10,000.

In a letter to the petitioner dated August 19, 1991, the Federation restated its position that Local 1211 properly denied funding for his Federal court litigation and declined further review of his allegations. This August 19, 1991, letter was the final correspondence between the petitioner and the Federation until the petitioner filed his unfair labor practice charge.

On February 4, 1992, the petitioner, proceeding *pro se*, filed an unfair labor practice charge with the Board, alleging that the Federation breached its statutory duty of fair representation under section 14(b)(1) of the IELRA by denying him funding for legal representation in his civil rights lawsuit against District 211. The Federation filed a reply in which it maintained that it owed the petitioner no duty of fair representation because it was not his exclusive bargaining representative, that the petitioner's civil rights claim was not within the scope of the grievance arbitration procedure and therefore the failure to provide him with representation would not have breached the duty of fair representation, and that the petitioner failed to allege that the Federation's actions were motivated by his union activity or lack thereof.

On July 1, 1992, the Executive Director of the Board recommended that the petitioner's charge be dismissed because, even assuming that the Federation was his exclusive bargaining representative, the evidence did not establish a *prima facie* case of intentional misconduct as required by section 14(b)(1). The Executive Director also found that the petitioner had "failed to establish that he was in any way entitled to *** legal representation under the collective bargaining agreement."

The petitioner, still proceeding *pro se*, filed timely exceptions to the Executive Director's recommended decision in an attempt to persuade the full Board to reject it. He did not attach a certificate of service to his exceptions and the record indicates that the Federation filed no response to them. The Federation denies that it was served with, or otherwise had notice of, the petitioner's exceptions.

On September 11, 1992, the full Board struck the petitioner's exceptions and affirmed the Executive Director's recommended decision "[b]ecause [the petitioner] failed to serve [them] and attach a certificate of service." The Board also held that even if it were to consider the merits of the exceptions, it would not have found that the Federation breached the duty of fair representation under the IELRA. In noting that the petitioner had not adduced evidence sufficient to prove a *prima facie* case of intentional misconduct, the Board stated that "[a] union's actions constitute 'intentional' misconduct when such actions are conducted in a 'deliberate and severely hostile manner, or [when the Union engages] in fraud, deceitful action or conduct.' *Hoffman v. Lonza, Inc.*[,] 658 F.2d 519, 108 LRRM 2311 (7th Cir. 1981)."

On review, the petitioner maintains that (1) the Board improperly struck his exceptions because the record lacks any indication that the Federation suffered prejudice as a result of his failure to attach a

certificate of service and (2) that the Board applied an improper definition of "intentional misconduct" in determining whether the Federation breached its duty of fair representation. The Board maintains that its determination was justified because its regulations specifically define lack of notice of the filing of a document as prejudicial and because its definition of "intentional misconduct" was fully consistent with the IELRA. The Federation, in addition to concurring with the Board's assertions, urges three additional reasons for the denial of the petitioner's appeal: (1) that the Board lacked jurisdiction because the petitioner failed to file his charge within six months of the alleged unfair labor practice as required under the IELRA;[1] (2) that it did not owe the petitioner a duty of fair representation given that Local 1211 was his exclusive bargaining representative; and (3) that the failure to fund the petitioner's Federal civil rights suit would not in any event have been cognizable as a breach of the duty of fair representation. Since these latter three issues raised by the Federation are more foundational in nature and would be dispositive of this appeal, we shall consider them first.

THE BOARD'S JURISDICTION

On review, the Federation raises for the first time the issue of the Board's jurisdiction. It maintains that the Board lacked jurisdiction because the petitioner filed his unfair labor practice charge on February 4, 1992, more than six months after June 10, 1991, the date when the alleged unfair labor practice would have occurred. The petitioner counters that he timely filed his charge because the unfair labor practice actually occurred on August 19, 1991, the date of the Federation's last letter to him. He maintains that its letter of June 10, 1991, rejecting his request was only a tentative denial.

■ Section 15 of the IELRA provides in pertinent part:

"No order shall be issued upon an unfair labor practice occurring more than 6 months before the filing of the charge alleging the unfair labor practice." (Ill. Rev. Stat. 1991, ch. 48, par. 1715.)

In *Charleston Community Unit School District No. 1 v. Illinois Educational Labor Relations Board* (1990), 203 Ill. App. 3d 619, 561 N.E.2d 331, this language was construed as a jurisdictional provision rather than a period of limitations. The court there stated:

"[I]f the right being asserted is one unknown to the common law, the time limitation is an inherent element of the right and of the

---

[1]Although the Federation makes this argument for the first time on appeal, the petitioner does not challenge its right to do so.

power of the tribunal to hear the matter. On the other hand, *** if the right upon which the request for relief is based is a common law right, the time limitation is merely a procedural matter not affecting the jurisdiction of the tribunal and is subject to waiver." 203 Ill. App. 3d at 623, 561 N.E.2d at 333.

See also *Fredman Brothers Furniture Co. v. Department of Revenue* (1985), 109 Ill. 2d 202, 486 N.E.2d 893; *Board of Education of Jacksonville, School District No. 117 v. Illinois Educational Labor Relations Board* (1989), 183 Ill. App. 3d 972, 539 N.E.2d 882.

■ The duty of fair representation "proceeds directly from the union's statutory role as exclusive bargaining agent."[2] *Air Line Pilots Association International v. O'Neill* (1991), 499 U.S. 65, 74, 113 L. Ed. 2d 51, 62, 111 S. Ct. 1127, 1133; accord *Vaca v. Sipes* (1967), 386 U.S. 171, 177, 17 L. Ed. 2d 842, 850, 87 S. Ct. 903, 910 ("[T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct"); *Bartley v. University Asphalt Co.* (1986), 111 Ill. 2d 318, 324, 489 N.E.2d 1367, 1370 ("The duty of fair representation *** arises from a union's status as the exclusive bargaining representative ***"); see also Ill. Rev. Stat. 1991, ch. 48, par. 1703(b)("Representatives selected by educational employees in a unit appropriate for collective bargaining purposes shall be the exclusive representative of *all* the employees in such unit to bargain on wages, hours, terms and conditions of employment" (emphasis added)).

■ Since the petitioner's right of fair representation would arise from his exclusive bargaining representative's statutory status as such, rather than from the common law, the six-month period for exercising that right would condition the Board's jurisdiction. (See *Charleston Community School District No. 1 v. Illinois Educational Labor Relations Board*, 203 Ill. App. 3d at 623, 561 N.E.2d at 333.) Moreover, the language of section 15 reinforces the conclusion that the General Assembly intended that provision to both confer jurisdic-

---

[2]Aside from the question of whether the Federation or Local 1211 was the petitioner's exclusive bargaining representative, a question which shall be discussed later, if Local 1211 was in fact the Federation's agent, then the petitioner's unfair labor practice charge would relate back to Local 1211's rejection of his request for legal assistance in 1984 and would be unquestionably time-barred regardless of when the Federation denied his request for funding. However, this issue is not pursued by the parties and the record lacks sufficient data to determine whether such an agency relationship existed.

tion on the Board and to fix a time within which such jurisdiction must be exercised. A tribunal exercises its jurisdiction by acting. Thus, the "[n]o order shall be issued" language in section 15 could be translated as "no jurisdiction shall be exercised" and would indicate that it was intended to be jurisdictional rather than procedural. See *Charleston Community Unit School District 1 v. Illinois Educational Labor Relations Board*, 203 Ill. App. 3d at 624, 561 N.E.2d at 334.

■ With respect to the date of occurrence of the alleged unfair labor practice, the six-month filing period begins to run "when the charging party became aware (or should have become aware)" of the actions which allegedly constitute a violation of the IELRA. (*Wapella Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 177 Ill. App. 3d 153, 168, 531 N.E.2d 1371, 1380; accord *Moore v. Illinois State Labor Relations Board* (1990), 206 Ill. App. 3d 327, 335, 564 N.E.2d 213, 218.) Moreover, the filing period begins to run even if the charging party does not know the legal significance of the acts which constitute the alleged unfair labor practice. *Moore v. Illinois State Labor Relations Board*, 206 Ill. App. 3d at 335-36, 564 N.E.2d at 218-19.

■ Contrary to the petitioner's argument, the record shows that he became aware that the Federation would not fund his Federal civil rights litigation on or before July 3, 1991, the date of his reply to the Federation's June 10, 1991, denial of his request for funding. His July 3 letter indicates his awareness that, at that time, the Federation did not intend to fund his Federal lawsuit:

"Since you have made it clear that no financial backing will be given to me by the Union and no Union lawyer will be assigned to my case I am giving you the following two options to be fair and just to me or I will report the lawyers to the Attorney Disciplinary Committee in a short time and then wait for the proper time to file charges against you."

This language belies any argument that the petitioner understood the Federation's June 10, 1991, letter to be a tentative denial of his request for funding. He cannot extend the six-month period under the IELRA merely by repeated renewal of his request once it was denied. (*Cf. Jacksonville School District No. 117 v. Illinois Educational Labor Relations Board*, 183 Ill. App. 3d at 976, 539 N.E.2d at 884 (stating that filing a petition for reconsideration of an agency decision does not toll the 35-day filing period under the Administrative Review Law). See also 134 Ill. 2d R. 303(a)(2) (which analogously provides that "[n]o request for reconsideration of a ruling on a post-judgment motion will toll the running of the time within which a notice of appeal must be filed under this rule").) Accordingly, since the

petitioner knew of the acts which allegedly amounted to an unfair labor practice as early as July 3, 1991, more than six months before he filed an unfair labor practice charge on February 4, 1992, the Board lacked jurisdiction and any determination on the merits of his contentions would be void.

## THE DUTY OF FAIR REPRESENTATION

■ The Federation also maintains that even if the Board had jurisdiction over the petitioner's charge, only Local 1211, as the petitioner's exclusive bargaining representative, owed a duty of fair representation. It further maintains that, in any event, funding a Federal civil rights lawsuit would not have been within the scope of that duty. The petitioner maintains that "the [Federation] through words and actions, has undertaken to provide representation for Illinois teachers" and that "by its actions [the Federation] clearly undertook the responsibility to review [his] claim."

The record before us lacks a copy of the applicable collective bargaining agreement. The petitioner, however, conceded at oral argument that Local 1211, rather than the Federation, was his exclusive bargaining representative. Moreover, as stated above, "[t]he duty of fair representation stems from a union's status as the exclusive bargaining representative for a group of employees. [Citations.] The principle of exclusivity of representation therefore also defines the limits of the union's accountability; that is, only in those activities for which the union is the exclusive representative does the duty of fair representation attach." (*IAFF, Local 2, Chicago Fire Fighters Union (Nowak)*, 5 Pub. Employee Rep. (Ill.) par. 3023, No. L—CB—89—023 at XI—177 (Illinois Local Labor Relations Board, July 13, 1989), citing *Conley v. Gibson* (1957), 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99, and *Ford Motor Co. v. Huffman* (1953), 345 U.S. 330, 97 L. Ed. 1048, 73 S. Ct. 681; *Steele v. Louisville & Nashville R.R. Co.* (1944), 323 U.S. 192, 89 L. Ed. 173, 65 S. Ct. 226; accord *Air Line Pilots Association v. O'Neill*, 499 U.S. at 74, 113 L. Ed. 2d at 62, 111 S. Ct. at 1133 (indicating that the duty of fair representation "proceeds directly from the union's statutory role as exclusive bargaining agent"); *Bartley v. University Asphalt Co.*, 111 Ill. 2d at 324, 489 N.E.2d at 1370 (same).) We note that the petitioner does not contest this principle and in fact expressly acknowledged it at oral argument.

Given the petitioner's concession that Local 1211 was his exclusive bargaining representative, the Federation, although affiliated with Local 1211, would not have owed him a duty of fair representation. (See *IAFF, Local 2, Chicago Fire Fighters Union*

*(Nowak)*, 5 Pub. Employee Rep. (Ill.) par. 3023; *Air Line Pilots Association v. O'Neill*, 499 U.S. 65, 113 L. Ed. 2d 51, 111 S. Ct. 1127; *Bartley v. University Asphalt Co.*, 111 Ill. 2d 318, 489 N.E.2d 1367.) He cites no precedent in support of his apparent argument that the Federation incurred some obligation to provide him with representation by virtue its undertaking "the responsibility to review [his] claim."

Furthermore, even if the Federation were the petitioner's exclusive bargaining representative, the duty of fair representation would extend only to those activities connected with its duties as such and would not extend to obligations outside of the grievance mechanism of the collective bargaining agreement. (See *IAFF, Local 2, Chicago Fire Fighters Union (Nowak)*, 5 Pub. Employee Rep. (Ill.) par. 3023; *Air Line Pilots Association v. O'Neill*, 499 U.S. 65, 113 L. Ed. 2d 51, 111 S. Ct. 1127; *Bartley v. University Asphalt Co.*, 111 Ill. 2d 318, 489 N.E.2d 1367.) The record lacks any evidence that the collective bargaining agreement designated the Federation, Local 1211, or any other labor organization, as the petitioner's exclusive representative in forums outside of the grievance mechanism. Thus, even if the Federation had been the petitioner's exclusive bargaining representative, it would have had no obligation arising from the duty of fair representation to provide him with counsel in his Federal civil rights suit.

The petitioner contends that the Federation, by reviewing his case, undertook an independent obligation to provide representation in his Federal civil rights suit. In support, he points to *Knapp v. Whitaker* (7th Cir. 1985), 757 F.2d 827, in which the Federation funded a teacher's first amendment suit in Federal court even though it had no obligation to do so. He also points to brochures and other literature in which the Federation refers to *Knapp* in advertising that it will provide legal representation for Illinois teachers.

We note, however, that the Federation necessarily must exercise some degree of discretion in deciding how far to pursue members' complaints. (See *IAFF, Local 2, Chicago Fire Fighters Union (Nowak)*, 5 Pub. Employee Rep. (Ill.) par. 3023, at XI—177 (stating that a union retains discretion in deciding whether to pursue a grievance even given the duty of fair representation); *Moore v. Illinois State Labor Relations Board*, 206 Ill. App. 3d at 333, 564 N.E.2d at 217 ("[T]he duty of fair representation is not automatically breached when a union takes a position contrary to the interest of some of its members").) The exercise of that discretion would properly be based on criteria such as the perceived merit of the complaint, the likelihood of success in any action based thereon, the cost of prosecuting

such an action, or the possible benefit to the union membership as a whole.

Apparently, the Federation found greater overall merit or likelihood of success in the underlying complaint, *Knapp v. Whitaker*, than it found in the petitioner's grievance. Simply because the Federation funded the prosecution in *Knapp* would not necessarily create an obligation for it to do so in every case. Although it is conceivable that some common law right of action may accrue from a labor organization's discriminatory funding of private suits even where, as here, it has no duty to provide such funding, any such discrimination would not amount to a breach of the duty of fair representation.

## THE PETITIONER'S EXCEPTIONS

Any of the three foregoing contentions raised by the Federation, although not asserted by the Board in support of its determination, would be dispositive of this appeal. We will nevertheless proceed to discuss the reasons upon which the Board in fact predicated its decision. As noted above, those reasons are (1) the petitioner's failure to file a certificate of service to evidence proper service of notice upon the Federation of its exceptions and (2) the petitioner has failed to establish any intentional misconduct on the part of the respondent Federation. With respect to the first ground, the petitioner does not deny that he failed to serve the Federation with notice of his exceptions but contends that they were improperly stricken because "the record is devoid of any indication that the [Federation] suffered prejudice as a result of [his] failure to attach a certificate of service."

■ Under the Administrative Review Law, judicial review of an administrative agency's decision extends to all questions of law and fact presented by the entire record and the agency's conclusions on questions of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1991, ch. 110, par. 3—110; see also *Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 606 N.E.2d 1111.) With respect to an agency's interpretation of a statute, our supreme court stated in *City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 522 N.E.2d 1219:

"As a general rule, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration. [Citations.] An administrative agency's interpretation is not binding, however, and it will be rejected when it is erroneous." (122 Ill. 2d at 361, 522 N.E.2d at 1222.)

With respect to an agency's factual findings, the supreme court in *Abrahamson v. Illinois Department of Professional Regulation* stated:

"[I]t is not a court's function to reweigh the evidence or make an independent determination of the facts. Rather, the court's function is to ascertain whether the findings and decision of the agency are against the manifest weight of the evidence. [Citations.] An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. [Citations.]

The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. [Citation.] The reviewing court may not substitute its judgment for that of the administrative agency. [Citation.] If the record contains evidence to support the agency's decision, it should be affirmed. [Citations.]" 153 Ill. 2d at 88-89, 606 N.E.2d at 1117.

■ Section 5(i) of the IELRA empowers the Board to promulgate regulations which "it deems necessary and feasible to carry out [the] Act." (Ill. Rev. Stat. 1991, ch. 48, par. 1705(i).) Section 1100.20 of the Board's general procedures sets forth the requirements for the filing and service of documents. Subsections (e) and (f) of section 1100.20 apply specifically to this case:

"e) Whenever a document is filed with the Board, it shall be accompanied by a certificate of service. A certificate of service shall consist of a written statement, signed by the party effecting service, detailing the name of the party served and the date and manner of service.

f) Failure of a party to serve a document or failure to attach a certificate of service may be grounds to strike the document, if said failure results in prejudice to another party (such as lack of notice or detrimental reliance) or demonstrates disregard of the Board's processes (such as continued noncompliance)." 80 Ill. Adm. Code §§ 1100.20(e), (f) (1992).

The Board has not hesitated to strike exceptions to recommended decisions where they are not served on opposing parties. See *Minooka Community Consolidated School District 201*, 9 Pub. Employee Rep. (Ill.) par. 1005, Nos. 91—CA—0050—C, 91—CA—0051—C at IX—43 (Illinois Educational Labor Relations Board, November 17, 1992); *NEA, IEA, Rock Island Education Association*, 8 Pub. Employee Rep. (Ill.) par. 1050, Nos. 91—FS—0001—C, 92—CB—0006—C at IX—218 (Illinois Educational Labor Relations Board, May 14, 1992); *Prairie State College*, 8 Pub. Employee Rep. (Ill.) par. 1039, No. 92—CA—0013—C at IX—182 (Illinois Educational Labor Relations Board, March 12, 1992).

■ The petitioner would have us apply, by analogy, the decisional law construing Supreme Court Rule 104(b) (134 Ill. 2d R. 104(b) (stat-

ing the proof of service requirement for pleadings and motions)) which does not categorically invalidate filings for failure to show service of notice absent an affirmative showing of prejudice. (See, *e.g.*, *In re Marriage of Collins* (1987), 154 Ill. App. 3d 655, 506 N.E.2d 1000.) That analogy, however, is not compelling and does not control the Board's determination with respect to the requirements it seeks to impose on its own procedures.

Pursuant to section 5(i) of the IELRA, the Board has promulgated General Procedure 1100.20(f) in which it has found lack of notice of a filing by itself sufficient to establish prejudice. Here, the petitioner admittedly failed to attach a certificate of service to his exceptions and never asserts that the Federation was in fact served. Moreover, presumably because of the lack of notice, the Federation never appeared before the Board or otherwise responded. We therefore find insufficient reason to reverse the Board's determination to strike the petitioner's exceptions.

### THE INTENTIONAL MISCONDUCT STANDARD

The petitioner also challenges the standard which the Board applied in determining that the Federation would not have breached the duty of fair representation. He acknowledges that section 14(b)(1) of the IELRA, unlike its analogue, section 8(b)(1)(A) of the National Labor Relations Act (29 U.S.C. § 158(b)(1)(A) (1988) (hereinafter NLRA)), contains language which expressly requires "intentional misconduct" before a breach of the duty of fair representation can be established. However, he maintains that the interpretation of the phrase "intentional misconduct" which the Board drew from *Hoffman v. Lonza*, *i.e.*, that the union's acts must be deliberately and severely hostile or fraudulent, is too harsh, all but foreclosing fair representation claims. He further maintains that such a standard for determining whether the duty of fair representation has been breached is inconsistent with the Federal standard in duty of fair representation cases as set forth in *Vaca v. Sipes* (1967), 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903, and its progeny, which the Board purports to follow.

The Supreme Court in *Vaca v. Sipes* held that a union breaches its duty of fair representation when its actions are either arbitrary, discriminatory, or in bad faith. (386 U.S. at 177, 17 L. Ed. 2d at 850, 87 S. Ct. at 910.) Although the petitioner concedes that the Federation's conduct in denying his request for funding was neither discriminatory nor in bad faith, he contends that it nevertheless acted arbitrarily "[b]y failing to contact witnesses or read deposition transcripts" before denying his request for funding.

In applying the standard from *Vaca* in light of later Supreme Court decisions, the seventh circuit in *Hoffman v. Lonza* (7th Cir. 1981), 658 F. 2d 519 determined that substantially more culpable union conduct than negligence would be required to establish a breach of the duty of fair representation. As noted above, the court in *Hoffman* stated that the duty of fair representation "is not breached and the employee has no remedy without substantial evidence of fraud, deceitful action or dishonest conduct." (658 F.2d at 522, citing *Hines v. Anchor Motor Freight, Inc.* (1976), 424 U.S. 554, 47 L. Ed. 2d 231, 96 S. Ct. 1048; *Amalgamated Association of Street, Electric Ry. & Motor Coach Employees of America v. Lockridge* (1971), 403 U.S. 274, 29 L. Ed. 2d 473, 91 S. Ct. 1909; *Humphrey v. Moore* (1964), 375 U.S. 335, 11 L. Ed. 2d 370, 84 S. Ct. 363.) It further reasoned that "[t]he legal action based on the union's duty to fairly represent might be more properly labeled as an action for the union intentionally causing harm to an employee in a grievance proceeding." *Hoffman*, 658 F.2d at 522.

We agree that the analysis in *Hoffman* of the scope of the duty of fair representation under the NLRA is not in full alignment with other Federal decisions, including the subsequent United States Supreme Court decision in *Airline Pilots Association v. O'Neill*. There, in determining the scope of a union's duty of fair representation, the Supreme Court stated:

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' [citation] as to be irrational." (499 U.S. at 67, 113 L. Ed. 2d at 58, 111 S. Ct. at 1130.)

Unlike *Hoffman*, this definition approaches, but does not actually appear to require, purposefully invidious conduct. See also *Ooley v. Schwitzer Division Household Manufacturing Inc.* (7th Cir. 1992), 961 F.2d 1293, 1302 (criticizing the narrowness of the standard set forth in *Hoffman v. Lonza* in defining the scope of the duty of fair representation under the NLRA).

However, the isolated status of *Hoffman* in construing the NLRA is by no means dispositive of the duty of fair representation under the Illinois labor statute. Section 14(b)(1) of the IELRA, unlike section 8(b)(1)(A) of the NLRA,[3] expressly requires that an employee organization commit intentional misconduct for an unfair labor practice based on a breach of the duty of fair representation to arise:

---

[3] Section 8(b)(1)(A) of the NLRA provides that "[i]t shall be an unfair labor practice for a labor organization or its agents—to restrain or coerce employees in the exercise of rights guaranteed in section 157 of this title." 29

"(b) Employee organizations, their agents or representatives or educational employees are prohibited from:

(1) Restraining or coercing employees in the exercise of the rights guaranteed under this Act, *provided that a labor organization or its agents shall commit an unfair labor practice under this paragraph in duty of fair representation cases only by intentional misconduct in representing employees under this Act.*" (Ill. Rev. Stat. 1991, ch. 48, par. 1714(b)(1).)

The General Assembly added the italicized clause to section 14(b)(1) of the IELRA in 1989. (See Pub. Act 86—412, § 2, eff. August 30, 1989; 1989 Ill. Laws 2572.) This amendment apparently came in response to a 1988 decision of the Illinois State Labor Relations Board in which that body held that "it would find a violation of the duty [of fair representation] when the union, through inadvertence or gross negligence, virtually ignored a member's rights." *Moore v. Illinois State Labor Relations Board*, 206 Ill. App. 3d at 333, 564 N.E.2d at 217 (discussing *AFSCME (Mathis)*, 4 Pub. Employee Rep. (Ill.) par. 2049, No. S—CB—87—35 at X—342-X—343 (Illinois State Labor Relations Board, November 17, 1988)).

The General Assembly's amendment of section 14(b)(1) of the IELRA to require intentional union misconduct in 1989, after *Hoffman v. Lonza* had been decided, and echoing its specific language, provided an indication that it intended "intentional misconduct" to be interpreted in conformity with *Hoffman*. See generally *Laborer's International Union of North America, Local 1280 v. Illinois State Labor Relations Board* (1987), 154 Ill. App. 3d 1045, 1050, 507 N.E.2d 1200, 1204 (stating that where the General Assembly enacts a statute based on a Federal statute, "it may be presumed that the legislature adopted the language it did with knowledge of the construction previously enunciated in the Federal courts").

That indication is strengthened by the fact that the 1989 amendment of the IELRA to require intentional misconduct was a departure from the literal language of the NLRA which, as noted above, does not specify the level of culpability to which union conduct must rise to for a breach of the duty of fair representation to occur. See *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149 (stating that where the General Assembly has "departed from the NLRA's statutory scheme, it can be inferred that it intended a different result").

Given the foregoing, we have insufficient reason not to accord deference to the interpretation placed upon the phrase "intentional

---

U.S.C. § 158(b)(1)(A) (1988).

misconduct" under section 14(b)(1) of the IELRA by the Board, the agency charged with its administration. See *City of Decatur v. AFSCME, Local 268*, 122 Ill. 2d at 361, 522 N.E.2d at 1222.

 Beyond this, even applying the standard under the NLRA as construed in *Vaca* and *O'Neill*, we could not have said that the duty of fair representation had been breached. As previously noted, the petitioner does not argue that the Federation's actions were discriminatory or in bad faith but maintains only that it acted arbitrarily. Given the Federation's apparent weighing of the petitioner's prospect for success in his suit, along with its knowledge that three attorneys retained by Local 1211 had already found it lacking sufficient merit to warrant funding, we could not have said that the Federation's actions were "so far outside a 'wide range of reasonableness,' [citation] as to be irrational." *Air Line Pilots Association v. O'Neill*, 499 U.S. at 67, 113 L. Ed. 2d at 58, 111 S. Ct. at 1130.

CONCLUSION

For the reasons discussed above, we agree with the Federation's contention that the Board lacked jurisdiction to decide the petitioner's unfair labor practice charge by reason of the fact that he was, and continues to be, time barred. We would further agree that, even if jurisdiction existed, the Board properly struck the petitioner's exceptions and that its adoption of the Executive Director's recommended decision finds sufficient support in law and fact. Thus, whether for jurisdictional reasons, or on the merits, the unfair labor practice charge which the petitioner attempted to pursue warranted dismissal and the ultimate determination by the Board dismissing it is therefore affirmed.

Affirmed.

McNULTY and O'BRIEN, JJ., concur.